```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------
GROUNDHOG ENTERPRISES, INC.
d/b/a MERCHANT LYNX SERVICES,
                                     21-cv-4339 (JSR)
         Plaintiff,
                                     MEMORANDUM ORDER
      -v-

FRONTLINE PROCESSING CORP.,

Defendant.
------------------------------
```

JED S. RAKOFF, U.S.D.J.:

This case concerns the November 2020 purchase by plaintiff Groundhog Enterprises d/b/a Merchant Lynx Services ("Merchant Lynx") of a portfolio of defendant Frontline Processing Corp.'s payment processing contracts with a number of merchants. The largest account in this portfolio, in terms of revenue and profit, was a company called Moroid Inc. Shortly after the Asset Purchase Agreement ("APA") was entered into, Moroid terminated its processing relationship. Merchant Lynx alleges that Frontline was aware before the APA closed that this termination process had begun and that Frontline concealed that fact despite an alleged contractual obligation in the APA to disclose it as part of the representations and warranties made by Frontline in entering into the contract.

Before the Court is Frontline's motion for partial summary judgment. Frontline seeks dismissal of Merchant Lynx's fraud claim, which was brought alongside a claim for breach of contract. Frontline has two arguments: that the fraud claim should be struck as duplicative

1

under either of two Delaware state law doctrines, and that there is insufficient evidence in the record to support a fraud claim.

After the Court carefully reviewed the helpful papers and oral arguments submitted by counsel, it issued an order on January 13, 2022 denying Frontline's motion in full. The Court now issues a memorandum order setting forth its reasoning.

I. **Background**

Frontline was engaged in the business of marketing, distributing, selling, and supporting electronic payment processing services. ¶ 1.[1] In July 2020, Frontline and Merchant Lynch began negotiating over the sale of a portfolio of merchant processing agreements owned by Frontline. ¶ 2. This transaction ultimately closed through execution of the APA on November 23, 2020, Frontline transferred ownership of all rights related to the merchant accounts in the portfolio. ¶¶ 5-6. Under the APA, Merchant Lynx paid a total of $4.05 million for the portfolio of payment processing relationships.[2] The portfolio was defined to include, inter alia, "all of [Frontline's] rights relating to those merchant relationships boarded under the ISO Agreements (such merchant relationships listed on Attachment B and referred to herein

---

[1] ¶ Citations are to Merchant Lynx's response to Frontline's statement of undisputed material facts, ECF 28. Facts presented herein are either undisputed or viewed in the light most favorable to Merchant Lynx, the nonmovant. Additional facts, provided by Merchant Lynx in ECF 28, are identified by "Additional Fact ¶ __".

[2] Merchant Lynx's explains that this figure was calculated by multiplying the July 2020 profit figure for the portfolio by 40. ECF 27 ("Opp.") at 5.

2

as the "Merchants" or the 'Portfolio'), including all rights to receive residuals and other similar payments relating to the Portfolio." ¶ 4. Among the merchants included on Attachment B was Moroid Inc. See ECF 1-1 at 24.

The APA included a set of representations and warranties made by Frontline to Merchant Lynx, including Section 5.5(b), which stated:

> [Frontline] has fulfilled all material obligations required pursuant to each Material Contract[3] to have been performed by [Frontline] on its part prior to the date hereof and no default exists under any Material Contract. There is no existing dispute between [Frontline] and any merchant and to the best of [Frontline's] knowledge, no Merchant intends to terminate or materially reduce its processing volume as a result of the transactions contemplated by this Agreement or otherwise.

ECF 26-4 ("APA") § 5.5(b) at 5 (footnote inserted). Frontline further represented that none of Frontline's representations and warranties

---

[3] "Material Contracts" were defined by those listed in an attached SCHEDULE 5.5(A). Section 5.5(a) stated:

> Attached hereto as SCHEDULE 5.5(A) is a true and correct list of each contract, except for the ISO Agreements (each a "Material Contract" and collectively, the "Material Contracts") (i) under which Seller or any Affiliate (as that term is defined below) of Seller is/are a party to or bound by that relates to the Portfolio, the Merchants or the ISO Agreements and which the consequences of a default by Seller, or a cancellation or termination could reasonably be a "Material Adverse Change" (as that term is defined below). For purposes of this Agreement, "Affiliate" shall have the meaning ascribed to such term in Rule 405 under the Securities Act of 1933, as amended (the "Securities Act"). For purposes of this Agreement, a "Material Adverse Change" shall mean any event, circumstance, condition, development, or occurrence causing, resulting, in having, or that could reasonably be expected to have, a material adverse effect on the Purchased Assets or the Portfolio or Buyer's ability to own, operate or obtain the financial benefit of the Portfolio.

APA § 5.5(a)

3

in the APA contained any untrue statement of a material fact or any material omission. ¶ 8. Finally, the APA limited Frontline's maximum liability arising from breach of any representations or warranties to $500,000, provided that this limit would not apply to any claims arising from willful breach or breach arising from fraud. Additional Facts ¶ 1.

During the first half of October 2020, Moroid Inc. stopped processing payments through Frontline. ¶ 10. Moroid was, from January 2020 through August 2020, either the largest or second-largest monthly account by sales volume in the Frontline portfolio, yet it was not listed as a Material Contract in SCHEDULE 5.5(A). Additional Facts ¶¶ 2-3. The Moroid account generated approximately $30,000 or 30% of the portfolio's total profits in July 2020, corresponding to an imputed contribution of $1.2 million to the total purchase price of the portfolio. Opp. 5.

On October 16, 2020 and at Moroid's request, Frontline's Merchant Compliance Manager Anders Truelson emailed Moroid a merchant closure request form, which would enable Moroid to terminate its account with Frontline, but Moroid did not return the completed form until November 30, 2020, after the closing date of the APA. ¶¶ 11, 14, 15. Truelson did not inform anyone else at Frontline about his having sent the form, and he was unaware that Merchant Lynx was negotiating to purchase the portfolio until after the APA closed. ¶¶ 12-13.

Moroid's account closure arose from a criminal investigation of Moroid by the New York field office of the Federal Bureau of

4

Investigation. Additional Facts ¶ 4. On October 16, 2020, Jeff Mendelson of Moroid called Truelson to close Moroid's account with Frontline. Id. ¶ 6. That same day, Truelson called David Guest, the Frontline sales agent for the Moroid account, to inform him that Mendelson had called Frontline to close the account. Id. ¶ 7. Guest later learned of the FBI investigation into Moroid after receiving a call from an FBI special agent on October 27, 2020. Id. ¶ 9. On or about October 29, 2020, Guest testifies that he called Frontline CEO Chris Kittler two or three times to discuss the FBI investigation and Moroid's request to shut down its account, though Kittler disputes that he learned any of this until after the APA closed. Id. ¶ 10-11.

## II. Legal Standard

"Summary judgment is appropriate only when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Coyle v. United States, 954 F.3d 146, 148 (2d Cir. 2020). Here, the Court must view all evidence in the light most favorable to Merchant Lynx, the non-movant, and draw all justifiable inferences in its favor, without weighing evidence or making credibility determinations. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## III. Discussion

Merchant Lynx brings claims for (a) breach of contract, alleging that Frontline breached the APA by failing to include Moroid on the SCHEDULE 5.5(A) list of Material Contracts and by failing to disclose that Morioid was in the process of terminating its contract, and (b)

fraud, alleging that Frontline intentionally misled Merchant Lynx by failing to disclose that a business relationship corresponding to 30% of the portfolio purchase price was in the process of termination. Frontline seeks dismissal of the fraud count as duplicative under two Delaware state law doctrines: bootstrapping and rehashing of damages. However, the Court concludes that neither Delaware doctrine applies.

### A. Whether the Fraud Claim is Duplicative

Frontline argues that Merchant Lynx's fraud claim must be dismissed because it is impermissibly "bootstrapped" off of the breach of contract claim. Under Delaware law, a plaintiff may not maintain a fraud claim alongside a breach of contract claim where the fraud is based on the same conduct as the breach claim and simply makes the additional allegation that the defendant intended not to perform. As the Court of Chancery recently explained:

> Delaware courts will find that improper bootstrapping has occurred when the plaintiff simply adds the words 'fraudulently induced' or alleges that the contracting parties never intended to perform as a means to plead fraud in cases where the parties are bound by contract. The bootstrapping is deemed improper because the plaintiff has simply tacked on conclusory allegations that the defendant made the contract knowing it would not or could not deliver on its promises.
>
> As our law in this area has evolved, it is now clear that improper bootstrapping does not occur: (1) where a plaintiff has made particularized allegations that a seller knew contractual representations were false or lied regarding the contractual representation, (2) where damages for plaintiff's fraud claim may be different from plaintiff's breach of contract claim, (3) when the conduct occurs prior to the execution of the contract and thus with the goal of inducing the plaintiff's signature and willingness to close on the transaction or (4) when the breach of contract claim is not well-pled such that there is no breach claim on which to "bootstrap" the fraud claim.

6

Pilot Air Freight, LLC v. Manna Freight Sys., Inc., 2020 WL 5588671, at *25-*26 (Del. Ch. Sept. 18, 2020). The Court of Chancery has also expressly distinguished instances of inappropriate bootstrapping, in which the plaintiff alleges simply "that the defendant never intended to abide by the agreement at issue when the parties entered into it," from claims that "pointed to specific misrepresentations by [the defendant], including misrepresentations about the sales results and financial condition of the Company made before the Execution of the [contract]." Osram Sylvania Inc. v. Townsend Ventures, LLC, 2013 WL 6199554, at *16 (Del. Ch. Nov. 19, 2013). Defendants' cited cases do not enunciate different legal propositions. Indeed, the cases cited by Groundhog denied dismissal for bootstrapping because those cases involved allegations that defendants had misrepresented present facts, not merely that they had intended not to follow through on their promises. See ECF 25 ("Mot.") at 5-6.

At least three of the distinctions identified by the Court of Chancery in Pilot Air Freight apply here.

First, the breach and fraud claims focus on different conduct. The gravamen of Merchant Lynx's breach of contract claim is that Frontline failed to list Moroid on the SCHEDULE 5.5(A) list of Material Contracts, as APA § 5.5(a) required, and Frontline failed to notify Merchant Lynx of MOROID's pending termination, as Merchant Lynx argues Section 5.5(b) requires. Compl. ¶¶ 26-37. Merchant Lynx's fraud count, by contrast, "ma[kes] particularized allegations that [Frontline] knew [the] contractual representations [in sections 5.5(a), 5.5(b), and

7

5.9] were false" at the time they were made. Pilot Air Freight, 2020 WL 5588671, at *26.

Second, the damages are distinct. Section 11.4(c) of the APA caps Frontline's compensatory breach of contract damages at $500,000. But the APA expressly excludes "any claims arising from willful breach or breach on account of fraud" from the liability cap. APA § 11.4(c)(i). Merchant Lynx argues that the Moroid account corresponded to $1.2 million of the portfolio's purchase price, meaning that it can only obtain full compensatory damages -- not to mention the exemplary damages for fraud sought in its prayer for relief -- via the fraud count.

Third, and related to both of the above, the fraud conduct alleged occurred before the APA closed, and the omitted information about Moroid's pending termination allegedly induced Merchant Lynx to close on the transaction at the previously agreed price, since that price was represented a 40x multiple of the monthly profits associated with the Moroid account. Viewing the evidence in the light most favorable to Merchant Lynx and drawing all reasonable inferences in its favor, the Court concludes that a reasonable jury could find that the alleged pre-close misrepresentations affected the purchaser's understanding of the financial condition of the portfolio and that Frontline's conduct was intentionally calculated to induce such reliance. See Osram Sylvania, 2013 WL 6199554, at *16.

Accordingly, the fraud count is sufficiently distinct from the breach of contract claim, so it cannot be dismissed for bootstrapping.

B. <u>Rehashing of Damages</u>

Frontline also argues that the fraud claim is precluded by Delaware's "rehash doctrine." Mot. 7-8. "A plaintiff alleging both fraudulent misrepresentation and breach of contract must prove that the damages pled under each cause of action are distinct." <u>4C, Inc. v. Pouls</u>, 2014 WL 1047032, at *7 (D. Del. Mar. 5, 2014). In other words, "The fraud damages may not simply 'rehash' the damages allegedly caused by the breach of contract." <u>Greenstar, LLC v. Heller</u>, 934 F.Supp.2d 672, 697 (D. Del. 2013) (quoting <u>Cornell Glasgow, LLC v. La Grange Props., LLC</u>., 2012 WL 2106945 (Del. Super. Ct. June 6, 2012)). The key is whether the fraud claims "aver any damages independent of those allegedly incurred by [the] alleged breach of the contract." <u>4C, Inc.</u>, 2014 WL 1047032, at *7.

Two distinctions in the damages claimed by Merchant Lynx have been recognized in Delaware cases as preventing dismissal under the rehash doctrine.

First, the breach claim is subject to a compensatory damages cap inapplicable to fraud claims. Delaware courts have held that damages are different and so claims are not duplicative where, "[w]ithout proving fraud, it is possible that Plaintiff's damages are limited to [a contractual cap]." <u>Swipe Acquisition Corp. v. Krauss</u>, 2020 WL 5015863, at *12 (Del. Ch. Aug. 25, 2020). Here, the APA expressly carves fraud claims out from Section 11.4(c)'s maximum aggregate liability cap, so Merchant Lynx can recover different amounts on its two claims. This is a familiar circumstance, and it is established

9

that "contractual limitation on damages opens the door to parallel breach of contract and fraud claims." Firmenich Inc. v. Nat. Flavors, Inc., 2020 WL 1816191, at *10 (Del. Super. Ct. Apr. 7, 2020).

Second, Merchant Lynx seeks exemplary damages for the fraud claim, but is limited to (capped) compensatory damages on the breach claim. While Frontline suggests that a fraud claim only passes the rehash doctrine if it seeks rescissory damages, the cases it cites do not establish the narrow scope for fraudulent inducement relief that Frontline asserts. See Mot. 7-8 (citing Abry Partners V, L.P., 891 A.2d 1032, 1064 (Del. Ch. 2006); Sehoy Energy LP v. Adriani, 2021 WL 2450435, at *10 (Del.Ch. June 16, 2021)). These cases only identify the plaintiffs' pursuit of rescissory damages as the particular form of independent damages pled in those cases. None suggests, as Frontline does, that rescissory damages are the only form of damages that will suffice to distinguish contract and fraud damages.

Since Merchant Lynx is seeking different measures of damages under its fraud and breach of contract claims, the rehash doctrine does not require dismissal.

## IV. Sufficiency of the Evidence

Frontline also argues that Merchant Lynx has failed to adduce evidence sufficient to establish scienter, and so the Court should grant summary judgment for the defendant on the fraud claim for lack of a dispute of material facts. Specifically, Frontline argues that the company lacked knowledge of the Moroid termination before the APA closed, so its alleged misrepresentations to Merchant Lynx were

unknowing. But there are at least two disputes of material fact on the issue of Frontline's scienter that prevent entry of summary judgment in its favor.

First, Frontline acknowledges, at least for the purposes of the motion, that Frontline's Merchant Compliance Manager, Anders Truelson, sent an account termination form to Moroid before the APA closed. But Frontline maintains that this is immaterial, because the company did not know about the impending termination. Since Truelson supposedly never told anyone else at the company that Moroid had begun the account termination process, Frontline argues that the company was not aware that the its pre-closing representations were false. But Frontline is wrong on the law. "An employee's knowledge can be imputed to her employer if she becomes aware of the knowledge while she is in the scope of employment, her knowledge pertains to her duties as an employee, and she has the authority to act on the knowledge." Hecksher v. Fairwinds Baptist Church, Inc., 115 A.3d 1187, 1200-01 (Del. 2015). Frontline does not dispute any of these elements with respect to Truelson's knowledge, so his knowledge that Moroid was in the process of terminating its merchant account can be imputed to Frontline. This imputation undercuts Frontline's contention and prevents entry of summary judgment in its favor.

Second, and independently, Frontline acknowledges that its CEO owner and CEO, Chris Kittler, was told by the responsible Frontline sales agent, David Guest, about the FBI investigation into Moroid. Frontline maintains that Guest only testified that he "urged Frontline

11

to shut down the Moroid merchant account, [but] he never told Frontline that Moroid had terminated or was intending to terminate its merchant relationship." Mot. 11. But viewing the evidence and drawing all inferences in Merchant Lynx's favor, the record reflects that Kittler was on notice that the FBI had identified Moroid as having used the Frontline merchant account to process fraudulent transactions, giving rise to the clear inference that Kittler knew the account would soon be closed, notwithstanding that Guest testified that Kittler poopooed this possibility to Guest.[4] Accordingly, the Court concludes, viewing the evidence in the light most favorable to Merchant Lynx, that the Frontline CEO knew that Moroid was likely to reduce its processing volume in the near future or that he intended to remain willfully blind to those facts. Since Kittler, as owner, stood to benefit from the allegedly inflated price Merchant Lynx would pay for Frontline's portfolio, there is a plausible inference that Kittler had the necessary scienter to support a fraud claim.

Accordingly, the Court concludes that genuine factual disputes prevent dismissal of the fraud claim for insufficient evidence.

## V. Conclusion

For the reasons set forth above, the Court denies Frontline's motion for partial summary judgment. This case will proceed to trial in July 2022, as reflected on the docket.

---

[4] While Kittler denied that this conversation took place, the Court is bound to resolve this credibility dispute in Merchant Lynx's favor on Frontline's motion for summary judgment.

SO ORDERED.

New York, NY
February 14, 2022

_____
JED S. RAKOFF, U.S.D.J.